**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **8:05CR199** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **FRED DAVID RODRIGUEZ-SOLIS,** | ) | **REPORT AND** |
| **JOSE C. CONTRERAS-CORTEZ,** | ) | |
| **JOSUE MARTIN RODRIGUEZ-LOPEZ and** | ) | **RECOMMENDATION** |
| **JOSE HERNANDEZ-MENDOZA,** | ) | |
| | ) | |
| **Defendants.** | ) | |

This matter is before the court on the motions to suppress by defendants Fred David Rodriguez-Solis (Rodriguez-Solis) (Filing No. 37), Jose C. Contreras-Cortez (Contreras-Cortez) (Filing No. 27), Josue Martin Rodriguez-Lopez (Rodriguez-Lopez) (Filing No. 31) and Jose Hernandez-Mendoza (Hernandez-Mendoza) (Filing No. 33). The defendants are charged in an Indictment along with co-defendants Duane Charles Anderson (Anderson) and Rogelio L. Valenzuela-Lopez (Valenzuela-Lopez) with a conspiracy to distribute and possess with intent to distribute in excess of 500 grams of methamphetamine (Count I) in violation of 21 U.S.C. § 846. Valenzuela-Lopez is charged in Count II with the distribution of less than 50 grams of methamphetamine in violation of 21 U.S.C. § 841(a)(1). Anderson is charged in Count III with the possession with intent to distribute less than 50 grams of methamphetamine in violation of 21 U.S.C. § 841(a)(1). Hernandez-Mendoza is charged in Count IV with the possession with intent to distribute in excess of 50 grams of methamphetamine in violation of 21 U.S.C. § 841(a)(1). Rodriguez-Solis, Rodriguez-Lopez, Valenzuela-Lopez, and Hernandez-Mendoza are charged in Count V with the possession with intent to distribute in excess of 50 grams of methamphetamine in violation of 21 U.S.C. § 841(a)(1). Contreras-Cortez is charged in Count VI with the possession with intent to distribute in excess of 500 grams of methamphetamine in violation of 21 U.S.C. § 841(a)(1). Contreras-Cortez is also charged in Count VII with the use and carrying of a firearm in relation to a drug trafficking offense in violation of 18 U.S.C. § 924(c). Counts

VIII and IX charge a criminal forfeiture involving various sums of money and an automobile in violation of 21 U.S.C. § 853.

The court held combined hearings on the motions to suppress on August 23, 26, 31 and October 13, 2005. Rodriguez-Solis was represented by Kristina B. Murphree, Contreras-Cortez was represented by J. William Gallup, Rodriguez-Lopez was represented by Susan M. Bazis, and Hernandez-Mendoza was represented by M. Scott Vander Schaaf. The United States was represented by Special Assistant Jennie M. Dugan-Hinrichs and Assistant U.S. Attorney Kimberly C. Bunjer. Chandler Thompson, a certified interpreter in the Spanish language, served as the interpreter by remote telephone hook-up.

During the hearings, the court heard the testimony of Sergeant Greg Gonzalez (Sergeant Gonzalez), and Officers Kara Hindman (Officer Hindman), Jeffrey Hunter (Officer Hunter), Pamela Heidzig (Officer Heidzig), and Mark Lang (Officer Lang), Lieutenant Richard Gonzalez (Lieutenant Gonzalez) of the Omaha Police Department (OPD), Special Agent Ovidio De La Fuente (Agent De La Fuente) of the Bureau of Immigration and Customs Enforcement (ICE) of the U.S. Department of Homeland Security, and Special Agent Gregory Beninato (Agent Beninato) of the Federal Bureau of Investigation (FBI). The court also received into evidence the following: an affidavit for search warrant (Exhibit 1), a permission for search (Exhibit 2), copies of business cards with identification (Exhibit 3), copy of seized business card (Exhibit 4), a photograph of a house (Exhibit 5), a floor plan of a house (Exhibit 6), a picture of a house (Exhibit 8) and a picture of a corner of a house (Exhibit 9). A consecutively paginated transcript (TR.) of the hearings was filed on September 22, 2005 (Filing Nos. 52, 53-Sealed, 54, 55, 56-Sealed, and 57), and on November 4, 2005 (Filing No. 61). The government filed a post-hearing brief on November 14, 2005 (Filing No. 62). Contreras-Cortez filed a post-hearing brief on November 16, 2005 (Filing No. 63). Upon motion, further briefing was extended to December 7, 2005 (Filing No. 64). No additional briefs were filed by any of the parties. The motions were deemed submitted on December 7, 2005.

## FINDINGS OF FACT

On March 21, 2005, Sergeant Gonzalez received information from a confidential informant regarding drug activities at 2616 Poppleton Avenue, Omaha, Nebraska (TR. 60). Sergeant Gonzalez has known the informant for approximately six years and the informant has provided reliable information to police in the past which led to arrests and prosecutions of drug traffickers (TR. 9). Sergeant Gonzalez and Officer Tony Espejo (Officer Espejo) met with the confidential informant who told the officers that two Hispanic males, named Josue and Freddy, were distributing quantities of 'ice" methamphetamine from Apartment 7 at 2616 Poppleton Avenue (TR. 7). The informant told the officers that Freddy was a younger Hispanic male in his late teens, had a stocky build, and was balding (TR. 8). The informant described Freddy as having ties to a local Hispanic gang, i.e., the Sureños, and that his friend would hang out at the apartment (TR. 11). The informant described Josue as a Hispanic male in his twenties and older than Freddy (TR. 8). The informant told the officers that both Freddy and Josue worked at the Old Market Auto on south 10th Street in Omaha which was across from Angie's Restaurant (TR. 8). The informant also told the officers that Josue lived on south 24th Street in Omaha (TR. 8). The informant told the officers that Josue was driving a full-sized, red and white pickup (Dodge or Chevy), that Freddy was driving a silver colored Ford Thunderbird, and another individual who may be living at 2616 Poppleton drove a silver or gray colored Tempo compact-type vehicle (TR. 9).

After meeting with the informant, the officers drove to Apartment 7 at 2616 Poppleton Avenue and attempted to make contact with the residents by knocking on the door (TR.10). 2616 Poppleton Avenue is a two story frame house consisting of two apartments (TR. 12-13; Exhibits 5,6,8 and 9). The door to apartment 7 is next to the driveway at the residence (TR. 12). The officers received no answer and decided to set up surveillance to observe any traffic going to and coming from the residence (TR. 10). As they were walking down the driveway adjacent to the residence, a green colored compact car pulled up in front of the residence (TR. 10). Officer Espejo recognized the driver as Marcos Avila who was a Sureño gang member and whose driver's license was suspended (TR. 10; 13-15). As the car drove away, Officer Espejo pursued and stopped the vehicle

approximately three or four blocks away from the residence (TR. 13-14).  Officer Espejo had all the occupants get out of the vehicle and Officer Espejo arrested Marcos Avila for driving while his license was suspended (TR. 15).  Officer Espejo briefly interviewed Avila who said they showed up at the Poppleton Avenue residence to meet with a "Juan" about a vehicle (TR. 16).  Sergeant Gonzalez directed Officer Espejo to take Avila downtown and conduct a formal interview with Avila (TR. 16).  Following the interview, Sergeant Gonzalez was informed by Officer Espejo that Avila said that Juan had been living at Apartment 7 and that Avila and his friends would go to Apartment 7 and smoke "ice" (TR. 17).  Avila told Officer Espejo that Juan worked at the Old Market Auto on south 10th Street (TR. 18).  Avila said that Freddy also lived there and may have a brother who lived in an apartment on the upper level of the residence (TR. 18).  Avila also stated he and his friend were smoking "ice" at the apartment in the early morning hours the prior night (TR. 17).  Avila recalled an incident when he and his friends were smoking "ice" with Freddy in the apartment when Freddy's brother came downstairs and yelled at Freddy for smoking methamphetamine and broke a pipe (TR. 18).

Sergeant Gonzalez received another call from the informant around 6:45 p.m. on March 21st after Avila had been stopped (TR. 18).  The informant told Sergeant Gonzalez that he overheard a conversation that a drug transaction was about to take place whereby a Hispanic male would be driving a dark brown or maroon colored Jeep Cherokee with Old Market Auto blue paper dealer plates and would be driving to 2616 Poppleton Avenue, Apartment 7, to pick up a quantity of methamphetamine and deliver it to an unknown individual (TR. 19).  Sergeant Gonzalez set up surveillance on 2616 Poppleton Avenue and, shortly after the informant's telephone call, observed a dark colored Cherokee pull up just to the east of 2616 Poppleton Avenue (TR. 20).  Sergeant Gonzalez observed a balding Hispanic male get out of the Cherokee and walk towards the driveway and towards Apartment 7 of 2616 Poppleton Avenue (TR. 20).  The individual was later identified as Rogelio Valenzuela (Valenzuela) (TR. 21).  Shortly thereafter, Valenzuela walked back down the driveway, got into the Cherokee, and drove off down Poppleton Avenue (TR. 21).  Sergeant Gonzalez followed the Cherokee to the vicinity of 28th and Poppleton where the Cherokee stopped (TR. 22).  Valenzuela was out of the Cherokee and approached a

4

parked Blazer where Sergeant Gonzalez observed Valenzuela hand something to the driver of the Blazer (TR. 222). Sergeant Gonzalez then observed Valenzuela get back into the Cherokee and drive off (TR. 22). Sergeant Gonzalez believed he observed a drug delivery and followed the Blazer as it drove off (TR. 22). Sergeant Gonzalez radioed a marked police cruiser to conduct a traffic stop of the Blazer (TR. 23). The vehicle was stopped by a marked OPD cruiser and uniformed officers (TR. 23). The officers had the occupants, the driver identified as Anderson and a female passenger, get out of the vehicle (TR. 23). Anderson was searched and a half-ounce of methamphetamine was found stuffed in his sock (TR. 24). Anderson was arrested and interviewed by Officer Lang (TR. 25).

Anderson told Officer Lang that he was involved in a drug conspiracy including a group of Hispanic males who were distributing ice methamphetamine out of Apartment 7 at 2616 Poppleton Avenue (TR. 25). Anderson provided names, nicknames, physical descriptions, descriptions of vehicles used by the conspirators, and the Old Market Auto as a place of business where the conspirators either worked or frequented (TR. 25-26). Anderson told Officer Lang that Anderson had received multiple ounces of methamphetamine from various individuals over a one-year period of time (TR. 26). Anderson provided telephone numbers for individuals he would call using the names of Matty One, Matty Two, and Freddy (TR. 27). Anderson further told Officer Lang that among the vehicles used to deliver methamphetamine to him by Freddy was a silver-colored Ford Thunderbird (TR. 26-27).

Following the interview of Anderson, the OPD decided to call one of Anderson's suppliers and set up a drug sale (TR. 27). Prior to making the call, OPD officers set up surveillance at the Old Market Auto and 2616 Poppleton Avenue (TR. 28-29). Additional officers from the drug task force, FBI Agent Beninato and ICE Agent De La Fuente, and officers of the South Gang Unit were called upon to assist (TR. 29). Officer Heidzig reported she observed a Ford Thunderbird occupied by a lone Hispanic male at the Old Market Auto lot (TR. 31; 385-86). The Thunderbird's lights were off and the business appeared to be closed (TR. 31; 385). The Thunderbird began driving off and Officer Heidzig observed that the driver was a Hispanic male of stocky build with a bald head (TR.

32; 386).  Officer Heidzig was directed to have a traffic stop performed on the Thunderbird and to watch the occupant of the Thunderbird to see if the occupant was using his cell phone (TR. 33).   The occupant did not appear to use the cell phone (TR. 34-35). Uniformed OPD officers in a marked cruiser stopped the Thunderbird and Officer Heidzig parked behind the cruiser (TR. 388).  Officer Heidzig was informed that Officer Lang would place a telephone call to one of the cell phone numbers which Anderson had provided and Officer Heidzig was to listen if the cell phone of the occupant of the Thunderbird rang (TR. 389).  The cell phone did not ring (TR. 390).

The driver of the Thunderbird was Rodriguez-Solis (TR. 389).   When stopped Rodriguez-Solis produced a Mexican Consulate identification card but had no driver's license (TR. 37).  Rodriguez-Solis spoke little English and the uniformed officer waited for Sergeant Gonzalez to arrive (TR. 37).   Sergeant Gonzalez, who speaks Spanish, arrived at the traffic stop and was accompanied by Agent De La Fuente, who also speaks Spanish (TR. 37).   Sergeant Gonzalez and Agent De La Fuente approached Rodriguez-Solis who was seated in the Thunderbird and had Rodriguez-Solis get out of the Thunderbird (TR. 37).  Sergeant Gonzalez asked Rodriguez-Solis for paperwork on the car and a driver's license (TR. 37).   Rodriguez-Solis was also asked about where he lived and other biographical information (TR. 38-39).  Rodriguez-Solis stated he lived in north Omaha and denied living at 2616 Poppleton Avenue (TR. 39).   Sergeant Gonzalez described Rodriguez-Solis as sober but evasive and somewhat irate (TR. 40-42).   Agent De La Fuente took over the questioning and asked Rodriguez-Solis about his immigration status (TR. 42).  It was determined that Rodriguez-Solis was in the United States illegally and that he was driving after his license was suspended (TR. 42-43).  Rodriguez-Solis was arrested, placed in handcuffs, and placed in Sergeant Gonzalez's unmarked police vehicle (TR. 42-43; 291).  Sergeant Gonzalez directed that an inventory search of the Thunderbird occur and that the Thunderbird be towed (TR. 43).  Sergeant Gonzalez testified he conducted the inventory search "due to source information through Mr. Duane Anderson and as an active part of the ongoing investigation" (TR. 43).  A brief search of the Thunderbird resulted in the seizure of several pieces of paper with phone numbers on them and the word "Sureños 13" on one together with a set of keys in the ignition and a cell phone (TR. 44).

Rodriguez-Solis was transported to the central police station where he was interviewed by Sergeant Gonzalez and Agent De La Fuente (TR. 44). During this time, Sergeant Gonzalez was informed by other officers of his unit that Hernandez-Mendoza was observed arriving at Apartment 7 at 2616 Poppleton Avenue, staying a short time, and leaving whereupon other officers of the gang unit conducted a traffic stop of Hernandez-Mendoza for a traffic violation (TR. 45).

Hernandez-Mendoza did not signal a turn and made an improper turn, both traffic violations (TR. 135). Officers Gassaway and Hindman approached the Hernandez-Mendoza who was the lone occupant of a Ford Tempo (TR. 136). Hernandez-Mendoza had no identification and appeared very nervous (TR. 136). When Hernandez-Mendoza kept turning away from the officers and putting his hand near his front coat pocket, the officers removed him from the Ford Tempo (TR. 136). When Hernandez-Mendoza kept putting his hands in his pockets despite warnings from the officers, Hernandez-Mendoza was patted down and Officer Gassaway felt a large bulge in Hernandez-Mendoza's front pocket (TR. 137). After a data check was performed and revealed Hernandez-Mendoza was driving on a suspended license, Hernandez-Mendoza was handcuffed and searched thoroughly (TR. 138). Hernandez-Mendoza had 117 grams of methamphetamine in his right front coat pocket and approximately 15 grams of methamphetamine in his left boot (TR. 138). An inventory search of the Ford Tempo was performed before the car was taken to the impound lot (TR. 139). A six-inch knife was located under the driver's seat (TR. 139). Hernandez-Mendoza was placed in the police cruiser and taken to 2616 Poppleton Avenue (TR. 139).

Sergeant Gonzalez directed Officer Lang to prepare an affidavit and application for a search warrant of Apartment 7, 2616 Poppleton Avenue (TR. 47). The affidavit described (1) the information Sergeant Gonzalez received from the confidential informant regarding the drug activities at Apartment 7, 2616 Poppleton Avenue, (2) the March 21, 2005 arrest, search and questioning of Anderson regarding Anderson's drug trafficking over the past year involving Apartment No. 7 at 2616 Poppleton Avenue, and (3) the March 21, 2005 arrest, search, and questioning of Hernandez-Mendoza involving Apartment No. 7, 2616 Poppleton Avenue (Exhibit 1). The affidavit further set forth that narcotics officers had

secured the residence at Apartment No. 7, 2616 Poppleton Avenue, after locating the key to that residence in Hernandez-Mendoza's car (Exhibit 1).

Upon arrival at 2616 Poppleton Avenue with Hernandez-Mendoza in his police cruiser, Officer Hindman drove all the way up the driveway and was parked parallel to the door for Apartment No. 7 for about five minutes (TR. 140-41). Officer Gassaway drove Hernandez-Mendoza's car to 2616 Poppleton Avenue (TR. 143).

Lieutenant Gonzalez testified that on March 21, 2005, he was a Sergeant in charge of a gang unit and was asked by Sergeant Gonzalez for assistance regarding the investigation at 2616 Poppleton Avenue (TR. 195). After being briefed on the activity at 2616 Poppleton Avenue, he assisted in the investigation (TR. 196). As a gang unit supervisor, Lieutenant Gonzalez was familiar with the Sureños gang (TR. 197). Lieutenant Gonzalez described the Sureños as the largest Latino gang in the area and one of the most dangerous (TR. 197). The Sureños are noted for their well organized criminal activity in drug dealing, robbery, kidnaping and homicide (TR. 197). The gang also has a website on the internet (TR. 197). Lieutenant Gonzalez learned of the traffic stop of Hernandez-Mendoza and drove to the scene of the stop (TR. 198). After finding out the arresting officers found methamphetamine on Hernandez-Mendoza after he traveled from 2616 Poppleton Avenue, Lieutenant Gonzalez made the decision to take Hernandez-Mendoza back to 2616 Poppleton Avenue after conferring with Sergeant Gonzalez (TR. 199). Lieutenant Gonzalez was aware that an affidavit and application for a search warrant for Apartment No. 7, 2616 Poppleton Avenue was being prepared (TR. 200). He directed that Hernandez-Mendoza's key to Apartment No. 7 be used to gain entry while waiting for the search warrant to arrive (TR. 199-200). Lieutenant Gonzalez described his rationale for entry as follows:

> Again several factors why we went in. The fact that the manpower that we had was dwindling down pretty much to nothing, we had just arrested a party that left that apartment, and we — and we knew that there were other suspects out there as well that we were looking for. It started to rain at that time. The fact that we had gang members that were involved who are known for countersurveillance, known to have neighbors in countersurveillance. There's no way with the manpower that we had where we could set up in a secure

8

> position outside the residence without giving up our safety,
> and, again, the fact that it began to rain.  We decided to go in
> and secure the residence and wait for the search warrant to be
> signed that was being written at the time.

(TR. 199-200).

One of the keys from the set of keys that was in the ignition of the Ford Tempo was used to open the door to Apartment No. 7 and OPD officers entered the apartment (TR. 143).  The inside of Apartment No. 7 was very small consisting of one room and a small bathroom (TR. 143; 200).  The officers conducted a sweep of the room and bathroom for other persons and found none (TR. 200).  Officer Hindman remained in the cruiser outside with Hernandez-Mendoza while other OPD officers secured Apartment No. 7 (TR. 141).  Officer Hindman described the weather conditions as dark and raining very hard (TR. 141).  When informed by the other OPD officers that Apartment No. 7 was clear, Officer Hindman brought Hernandez-Mendoza inside Apartment No. 7 and seated him on the floor (TR. 141).

While waiting inside Apartment No. 7 for the search warrant to arrive, the officers monitored radio traffic regarding the ongoing investigation (TR. 202).  Surveillance Officers Maloney and Duffek, who were at a stationary position west of the residence, radioed that a Neon had just pulled up on Poppleton Avenue directly in front of the driveway facing eastbound (TR. 146).  The driver, Contreras-Cortez began walking up the driveway when he suddenly stopped and turned around and began walking briskly back to his car (TR. 146-147).  Officers Maloney and Duffek moved their car to next to the Neon and blocked Contreras-Cortez's movement (TR. 148; 202).  Officer Hindman came out of the apartment and approached Contreras-Cortez who was now in the Neon with the motor running (TR. 148).  When Contreras-Cortez could not produce an ID, he was removed from the Neon (TR. 148; 203).  Officer Hindman asked for a male officer to pat Contreras-Cortez down (TR. 279).  Lieutenant Gonzalez conducted a pat-down search of Contreras-Cortez (TR. 203).  Lieutenant Gonzalez felt several lumps in Contreras-Cortez's coat pocket (TR. 203).  Believing the lumps to be narcotics, the lumpy items were removed and found to be bundles of U.S. currency, approximately $850 each (TR. 203).  Lieutenant Gonzalez testified:

> We proceeded to take the gentleman into apartment number two [sic] where we were so we could get out of – first of all, the weather was – it was raining, and we wanted to get out of the front of the apartment 'cause we had other suspects that we were looking for as well, so we decided to take him in, and because he had no ID, we were probably eventually going to take him down for an ID check.

(TR. 203-04). Contreras-Cortez was handcuffed, taken inside Apartment No. 7, and was turned over to Agent De La Fuente and Agent Beninato, both Spanish speakers, because Contreras-Cortez did not speak English (TR. 204). Lieutenant Gonzalez told Agent De La Fuente that Contreras-Cortez was leaving the area quickly and asked Agent De La Fuente and Agent Beninato to interview Contreras-Cortez (TR. 293). Agent De La Fuente and Agent Beninato and an Omaha police officer, all armed but with weapons sheathed, took Contreras-Cortez into the bathroom, described as being three feet by six feet in dimensions (TR. 319). Contreras-Cortez was not given any ***Miranda*** warnings as Agent De La Fuente questioned Contreras-Cortez about who he was, where he lived, what he was doing in the area, names, his date of birth, and parents' names (TR. 319-320). Contreras-Cortez provided information as to a prior apprehension by the border patrol and biographical information (TR. 294). Contreras-Cortez stated he lived in the area of 30th and Pacific Streets in Omaha, but could not provide an exact address (TR. 294). One of the other officers stated that Contreras-Cortez resided close by (TR. 294). Agent De La Fuente asked Contreras-Cortez if he knew anybody in the area or if he stayed close by in the area to see if Contreras-Cortez would "come clean" with the information (TR. 295). Contreras-Cortez stated he had a friend who lived somewhere in the building (2616 Poppleton Avenue) (TR. 295). Someone produced a set of keys, presumably those taken from the Neon Contrears-Cortez was driving, which was contained in an envelope with other items (TR. 439), Agent De La Fuente asked Contreras-Cortez if any one of the keys would fit one of the locks in the apartments in the building (TR. 295). Contrearas-Cortez said none of the keys would fit as he lived in the area of 30th and Pacific (TR. 295). Whereupon Agent Beninato began asking Contreras-Cortez the same questions and Contreras-Cortez maintained his answers (TR. 295). Agent Beninato produced a bill from the envelope which had the keys and the bill had Contreras-Cortez's name and the address of Apartment No.

2, 2616 Poppleton, on the bill (TR. 439).  When asked about the bill, Contreras-Cortez said he did not know where the bill came from (TR. 440).

Another officer interrupted them and asked Agent Beninato to bring Contreras-Cortez upstairs to Apartment No. 2 (TR. 441).   Contreras-Cortez was taken outside Apartment 7 on the main floor and up some stairs to a hallway outside Apartment No. 2 (TR. 442).   Outside of the door to Apartment No. 2 were Contreras-Cortez, Agents Beninato and De La Fuente, and at least one OPD officer including Officer Gassaway (TR. 296).  Agent Beninato again asked Contreras-Cortez if he lived at Apartment No. 2 and Contreras-Cortez said "no" (TR 442).   Officer Gassaway knocked on the door and announced "Police.  Anybody home?", which Agent De La Fuente repeated in Spanish (TR. 296).  The announcements were made a second time with no response (TR. 296).  Agent De La Fuente asked Contreras-Cortez if Contreras-Cortez was sure there was nobody at home and Contreras-Cortez remained silent and bowed his head (TR. 296).   Officer Gassaway, using the set of keys taken from Contreras-Cortez, inserted one of the keys into the lock of Apartment No. 2 and the lock turned (TR. 296).  Agent Beninato again asked Contreras-Cortez if he lived in Apartment No. 2, and Contreras-Cortez said he did (TR. 442).  When asked if anybody else lived there or was present, Contreras-Cortez said "no" (TR. 442).   When asked if the officers could go in and search the apartment, Agent Beninato recalled Contreras-Cortez saying "yes" (TR. 443).[1]  The door was opened and several OPD officers went inside and conducted a protective sweep of the apartment finding no one present (TR. 297).  One of the officers stated he saw a small amount of drugs or contraband in the kitchen area (TR. 297).

Agent De La Fuente took Contreras-Cortez inside Apartment No. 2 where Agent De La Fuente began to ***Mirandize*** Contreras-Cortez and complete a written permission to

---

[1] Agent De La Fuente recalls Contreras-Cortez saying "yes" to a search of Apartment No. 2 while Contreras-Cortez was still in Apartment No. 7 (TR. 297). Lieutenant Gonzalez recalled Contreras-Cortez told the officers while Contreras-Cortez was in Apartment No. 7 that he had a key to Apartment No. 2 and stayed there sometimes (TR. 205).  Lieutenant Gonzalez also recalled that Contreras-Cortez was asked if Contreras-Cortez would mind if the police officers could go up to Apartment No. 2 and speak to Contreras-Cortez's roommate to confirm his story since Contreras-Cortez had a key to the apartment and sometimes stayed there (TR. 205). Lieutenant Gonzalez did not recall Contreras-Cortez's exact response other than Contreras-Cortez had no problem with the officers proceeding upstairs and checking on Apartment No. 2 (TR. 205-206).

search form (TR. 297). Agent De La Fuente read the form to Contreras-Cortez in Spanish and Contreras-Cortez signed the permission to search (TR. 299; 443; Exhibit 2). After being advised of his *Miranda* rights, Contreras-Cortez declined to make any statements or answer questions except he asked Agent De La Fuente how long is would be before Contreras-Cortez would go back to Mexico (TR. 299; 443). Apartment No. 2 was searched and Contreras-Cortez was seated on the floor in the apartment while it was being searched and fell asleep (TR. 445). A large amount of methamphetamine, approximately $12,000 in cash, and a firearm was found in the apartment (TR. 446).

While the officers were in Apartment No. 2 upstairs, Hernandez-Mendoza remained in Apartment No. 7 downstairs (TR. 143). From his initial placement in the apartment, Hernandez-Mendoza was moved to being seated on the bed in the one-room apartment (TR. 144). With Officers Branch and Hindman remaining in the apartment with Hernandez-Mendoza, the officers could hear the commotion upstairs while the officers were searching Apartment No. 2 and heard one of the officers say that "ice" was found (TR. 145). At that point the following occurred:

> Q.    (Ms. Dugan Hinrichs to Officer Hindman) And then what happened?
> A.    (Officer Hindman) At that time, Mr. Hernandez was – was just seated there, all of the sudden, he starts this (indicating), kind of flinging his head up to the right, and he's looking up, and kind of shrugging like that (indicating). He was still handcuffed at the time. I asked him basically what he needed and he – and he – and he quoted, It's up there. It's all up there. That's all I have.
> Q.    And was that – was his motions or that statement in response to any questions that you asked him?
> A.    No. It was silent in the room.

(TR. 144).

Officer Lang was tasked to prepare the affidavit and application for a search warrant for Apartment No. 7 after Hernandez-Mendoza's stop and arrest (TR. 516). Officer Lang prepared the search warrant papers and took them to a Douglas County judge who signed the search warrant at 1:00 a.m. on Tuesday, March 22, 2005 (TR. 517; Exhibit 1). Officer Lang telephoned Sergeant Gonzalez and informed him that the warrant had been signed and that Officer Lang was on his way to the apartment (TR. 518). When Officer Lang

arrived, the officers had already commenced their search of the apartment (TR. 518). Officer Lang reviewed some of the evidence seized, particularly various business cards, so as to relate the items to the investigation (TR. 519-520).

As part of the investigation, Officer Heidzig was tasked to locate a vehicle involved in the investigation, a Jeep Cherokee, maroon or brown in color (TR. 393). In the early morning hours of March 22, 2005, Officer Heidzig located the vehicle parked in the rear of 1526 South 24th Street in Omaha (TR. 392). The Jeep was parked in a paved alleyway in the rear of the house (TR. 393). Officer Heidzig radioed Sergeant Gonzalez for assistance before going to the residence and doing a "knock and talk" with Josue Rodriguez-Lopez whom the officers believed to be residing at the residence (TR. 393). After waiting an hour, other officers arrived (TR. 394). Lieutenant Gonzalez, Agent Beninato and De La Fuente, and OPD Officers Gassaway, Collins, and Wells arrived at the location (TR. 394-395). Officer Heidzig and the two federal officers walked to the front door and knocked (TR. 395). Josue Rodriguez-Lopez answered the door and permitted the officers to enter when they asked to step inside (TR. 395). Officer Heidzig told Rodriguez-Lopez about the ongoing investigation which had been conducted during the course of the night, that he was being implicated along with his brother, and that his brother, Fred, had been arrested and taken downtown (TR. 396). Lieutenant Gonzalez then entered the residence with the other OPD officers (TR. 396). When asked, Rodriguez-Lopez stated that he, his wife, and kids were the only ones in the house (TR. 396). Officer Heidzig told Rodriguez-Lopez that for safety's sake, the officers would sweep the house and be sure of the occupants, which the officers did (TR. 396). Officer Heidzig asked for permission to search the house, and Rodriguez-Lopez refused (TR. 397). Rodriguez-Lopez had a cell phone in his pocket (TR. 398). There is a divergence of testimony as to how the cell phone was located. Officer Heidzig testified the cell phone was retrieved from Rodriguez-Lopez's shirt pocket from a search incident to arrest after Rodriguez-Lopez had been handcuffed (TR. 398). Lieutenant Gonzalez recalled that Rodriguez-Lopez handed the cell phone to Lieutenant Gonzalez before Rodriguez-Lopez was handcuffed (TR. 250-251). Neither Agent De La Fuente nor Agent Beninato recalled the sequence of events relating to the cell phone (TR. 302-303; 449-450). Officer Heidzig made telephone contact with

13

Sergeant Gonzalez at another location while he was investigating an address of another suspect in the investigation (TR. 58). Apparently, Sergeant Gonzalez called or had someone dial the telephone number used by Anderson to order drugs and the cell phone which was in Rodriguez-Lopez's pocket rang (TR. 398-400). Rodriguez-Lopez told Sergeant Gonzalez that the cell phone was not his since his cell phone was in a charger in the bedroom (TR. 398). Three cell phones were seized that evening from the house occupied by Rodriguez-Lopez (TR. 400). Rodriguez-Lopez was transported downtown to Central Police Headquarters.

## LEGAL ANALYSIS

### A. Rodriguez-Solis' Motion to Suppress (Filing No. 37)

Rodriguez-Solis asserts that the traffic stop of his Thunderbird on March 21, 2005, was illegal as was his arrest and the subsequent search and seizure of the Thunderbird. The government asserts there was sufficient reasonable articulable suspicion of criminal activity to stop Rodriguez-Solis' Thunderbird on the evening of March 21, 2005. Further, following the stop, Rodriguez-Solis was properly arrested for driving without a license. The subsequent search of Rodriguez-Solis and the Thunderbird were incident to his arrest.

The court agrees with the government's position in this matter and finds that the police officers had a reasonable articulable suspicion of ongoing criminal activity to warrant a stop of Rodriguez-Solis' Thunderbird on the evening of March 21, 2005, pursuant to *Terry v. Ohio*, 392 U.S. 1, 25-31 (1968); *United States v. Sharpe*, 470 U.S. 675, 682 (1985); *United States v. Navarrete-Barron*, 192 F.3d 786, 790 (8th Cir. 1999). The reasonable suspicion necessary to justify an investigatory stop must include "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21; **see** *Navarrete-Barron*, 192 F.3d at 790. In addition to the findings of fact set forth by the court in the Findings of Fact section above, the court adopts the litany of facts set forth by the government in its post-hearing brief (Filing No. 62, pages 3-7). Not only was there reasonable articulable suspicion under *Terry*, there was also sufficient probable cause to stop the vehicle. Probable cause exists when the totality of circumstances demonstrates that a prudent person would believe that

14

an individual has committed or was committing a crime.  ***Kuehl v. Burris***, 173 F.3d 646, 650 (8th Cir. 1999).  The courts must give law enforcement officers "substantial latitude in interpreting and drawing inferences from factual circumstances."  ***United States v. Washington***, 109 F.3d 459, 465 (8th Cir. 1997).

Once Rodriguez-Solis was stopped, it was determined that he was driving without a license and arrested.  The arrest was in accordance with Nebraska statutes.  **See *Neb. Rev. Stat*.** §§ 60-484 and 60-4,111.  Once lawfully arrested, Rodriguez-Solis was legally searched incident to that arrest.  ***United States v. Robinson***, 414 U.S. 218 (1973).  Following Rodriguez-Solis' arrest, the Thunderbird in which he was arrested was legally searched.  "The law is clear that officers may search the passenger compartment of an automobile and examine the contents of any containers found within the passenger compartment when they have made a lawful custodial arrest of the occupant of an automobile." ***United States v. Williams***, 165 F.3d 1193, 1195 (8th Cir. 1999) (**citing *New York v. Belton***, 453 U.S. 454 (1981)).

Rodriguez-Solis' motion to suppress should be denied.

### B. Contreras-Cortez's Motion to Suppress (Filing No. 27)

Contreras-Cortez asserts that he was illegally stopped and seized outside of 2616 Poppleton Avenue on March 21, 2005, and that any evidence obtained from him or his vehicle or from Apartment No. 2 subsequent to his seizure should be suppressed.  The government asserts that there was sufficient reasonable articulable suspicion to perform a ***Terry*** stop of Contreras-Cortez, his continued detention was reasonable, and that Contreras-Cortez voluntarily consented to the search of Apartment No. 2.

Contreras-Cortez was approached by police officers as he parked on the street outside 2616 Poppleton Avenue and walked up the driveway toward the entrance to Apartment No. 7 when he suddenly turned and walked briskly back to his car.  This was at a time when Apartment No. 7 was under active investigation and surveillance as a drug trafficking residence.  Whereupon, Contreras-Cortez was detained by having his car blocked from leaving his parking space by an unmarked police vehicle.  Thus an investigative detention of Contreras-Cortez began.

15

An investigative detention must be supported by a reasonable articulable suspicion of criminal activity.

> [The Eighth Circuit] has summarized the standards used to consider whether reasonable suspicion exists as follows:
> The standard of articulable justification required by the fourth amendment for an investigative, *Terry*-type seizure is whether the police officers were aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warranted suspicion that a crime was being committed. In assessing whether the requisite degree of suspicion exists, we must determine whether the facts collectively establish reasonable suspicion, not whether each particular fact establishes reasonable suspicion. The totality of the circumstances -- the whole picture -- must be taken into account. We may consider any added meaning certain conduct might suggest to experienced officers trained in the arts of observation and crime detection and acquainted with operating modes of criminals. It is not necessary that the behavior on which reasonable suspicion is grounded be susceptible only to an interpretation of guilt, however, the officers must be acting on facts directly relating to the suspect or the suspect's conduct and not just on a "hunch" or on circumstances which describe a very broad category of predominantly innocent [people].

*United States v. Beck*, 140 F.3d 1129, 1136 (8th Cir. 1998) (internal citations and quotations omitted); **see also** *Illinois v. Wardlow*, 120 S. Ct. 673, 676 (2000). Additionally, courts have held evasive and erratic behavior can contribute to a finding of reasonable suspicion. *United States v. Montero-Camargo*, 208 F.3d 1122, 1136-37 (9th Cir. 2000) (suspect took evasive and erratic path in an apparent attempt to avoid police, which was relevant to reasonable suspicion analysis); *United States v. Turpin*, 920 F.2d 1377, 1385 (8th Cir. 1990) (suspect exhibited erratic behavior and "alarm" after seeing police officers). Recently, the Supreme Court has held "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Wardlow*, 120 S. Ct. at 676. The *Wardlow* court held whether "the stop occurred in a 'high crime area' [is] among the relevant contextual considerations in a *Terry* analysis." *Id.* However, such presence alone is not enough to support reasonable suspicion. *Id.* The court noted that even where all of the suspect's conduct is lawful, if the conduct is ambiguous and susceptible to an innocent

16

explanation as well as creating a reasonable suspicion of criminal activity, police officers may detain the individual to resolve the ambiguity. *Id.* at 677.

In this case the police officers were within their authority to temporarily detain Contreras-Cortez to resolve any ambiguity with regard to his suspicious behavior directed at a residence of reported drug activity for which a search warrant was being obtained. The officers also properly conducted a pat down of Contreras-Cortez and the currency found on him should be admissible in evidence. However, no arrest was made of Contreras-Cortez until after he was brought into the 2616 Poppleton Avenue building and a search of Apartment No. 2 was conducted. Yet, Contrears-Cortez was handcuffed, taken into Apartment No. 7, and questioned in a small bathroom surrounded by armed police officers. The questioning went beyond any "biographical" information and resorted to questions about the apartment upstairs and keys to the apartment.

One of the principal factors is whether or not the defendant was in custody at the time of the statements. "A consensual encounter does not amount to a custodial situation requiring the administration of *Miranda* warnings." *United States v. Woods*, 213 F.3d 1021, 1023 (8th Cir. 2000).

"A *Miranda* warning must precede any custodial interrogation. A custodial interrogation involves questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *United States v. Chamberlain*, 163 F.3d 499, 502 (8th Cir. 1999) (**citing** *Miranda v. Arizona*, 384 U.S. 436 (1966)). "Custody occurs either upon formal arrest or under any other circumstances where the suspect is deprived of his freedom in any significant way." *United States v. Griffin*, 922 F.2d 1343, 1347 (8th Cir. 1990). "In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Thatsaphone v. Weber*, 137 F.3d 1041, 1044 (8th Cir. 1998) (**citing** *Stansbury v. California*, 511 U.S. 318, 322 (1994)). The definition of questioning includes, "either express questioning or . . . any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the [defendant]."

17

*United States v. Koontz*, 143 F.3d 408, 411 (8th Cir. 1998) (**citing** *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980)).  Failure to advise an in-custodial defendant of such rights will render statements inadmissible made by such a defendant as a result of police interrogation.  The questioning of Contreras-Cortez was improper.

The government asserts that Contreras-Cortez voluntarily consented to the search of Apartment No. 2.  The Fourth Amendment test for valid consent to search is that the consent be voluntary, and such "[v]oluntariness is a question of fact to be determined from all the circumstances."  *Ohio v. Robinette,* 519 U.S. 33, 40 (1996).  Some characteristics that aid in determining voluntariness of consent are age, intelligence, whether an individual was under the influence of drugs or alcohol, whether an individual was read his *Miranda* rights, and whether an individual had experienced prior arrests.  *United States v. Hathcock*, 103 F.3d 715, 719-20 (8th Cir.), **cert. denied**,117 S. Ct. 2528 (1997).  The court can also look at the period of time that the individual was detained; whether the police threatened, physically intimidated, or punished the individual; whether promises or misrepresentations were made upon which the individual relied; whether the individual was in custody or under arrest at the time of consent; whether the consent occurred in a public or secluded place; and whether the individual stood by silently while the search occurred. *Id.*  The burden is on the government to establish Contreras-Cortez voluntarily consented to the search of Apartment No. 2.  The court finds the government has failed to establish such consent.  The defendant was improperly detained inside Apartment No. 7, he was handcuffed and intimidated by the officers while confined in the small bathroom of Apartment No. 7, there was a divergence of testimony regarding the opening of Apartment No. 2 before any alleged verbal consent was given.  The written consent is of little significance since it was executed well after the officers entered Apartment No. 2.

Under these circumstances, the court cannot conclude that the consent was the product of a free and unconstrained decision or that the defendant comprehended the decision he made.  The combination of the custodial situation, defendant's admission of his immigration status, the presence of the numerous armed officers, the defendant's limited understanding of English, and the law enforcement officer's repeated and insistent

18

questions and commands created a coercive environment. The evidence demonstrates the defendant merely acquiesced to the search believing he had no other choice.

The court finds that Contreras-Cortez's motion to suppress should be denied as to the currency found on his person but otherwise granted.

### C. Rodriguez-Lopez's Motion to Suppress (Filing No. 31)

Rodriguez-Lopez asserts that he was illegally arrested on the morning of March 22, 2005 and that his person and residence at 1526 South 24th Street, Omaha, Nebraska, was illegally searched. The government asserts there was probable cause to arrest Rodriguez-Lopez, that the arresting officers were present in Rodriguez-Lopez's residence with his consent, and the items seized were incident to Rodriguez-Lopez's arrest.

A consent to entry or search of a residence must be voluntary. In addition to voluntariness, consent must be obtained form "the defendant or 'from a third party who possesse[s] common authority over or other sufficient relationship to the premises or effects sought to be inspected.'" *United States v. Adams*, 346 F.3d 1165, 1170-71 (8th Cir. 2003) (**quoting** *United States v. Matlock*, 415 U.S. 164, 171 (1974)). "The relevant inquiry is whether the facts available would have justified a reasonable officer in the belief that the consenting party had authority over the premises." *Id.*

In the present case, no evidence suggests Rodriguez-Lopez was threatened, intimidated, or promised anything in return for giving consent to entry of the 24th Street residence. After officers knocked on the front door and asked to enter, Rodriguez-Lopez, who answered the door, permitted the officers to enter (TR. 395). The officers had information that Rodriguez-Lopez lived at the residence (TR. 393). Rodriguez-Lopez told the officers he, his wife and children were the only people in the house (TR. 396). The officers conducted a protective sweep of the home (TR. 396). Although, the officers asked for consent to search Rodriguez-Lopez declined (TR. 397). The evidence indicates officers searched the premises and seized other cellular telephones in the residence (TR. 398-400).

Rodriguez-Lopez voluntarily allowed the officers to enter the residence by consenting verbally to their entry. However, Rodriguez-Lopez did not consent to a search. Further, the officers did not have a search warrant for the 24th Street house. The

government failed to show any exception to the warrant requirement exists for the search and seizure of items located at the 24th Street house. Accordingly, Rodriguez-Lopez's motion to suppress should be denied with regard to any alleged unconstitutional entry into the residence, but granted as to any evidence found based on the unconstitutional search of the premises.

Probable cause must exist to justify a warrantless arrest. ***United States v. Adams***, 346 F.3d 1165, 1169 (8th Cir. 2003). A court finds probable cause existed at the time of arrest when the available facts and circumstances are sufficient to warrant a person of reasonable caution to believe that an offense was being or had been committed by the person to be arrested. ***Id.***

> Probable cause exists if the totality of the circumstances known to all officers involved at the time of the arrest were sufficient to warrant a prudent person's belief that the suspect had committed or was committing an offense. Because probable cause requires only a probability or substantial chance of criminal activity, rather than an actual showing of criminal activity, the police need not have amassed enough evidence to justify a conviction prior to making a warrantless arrest.

***United States v. Mendoza***, 421 F.3d 663, 667 (8th Cir. 2005) (internal citations and quotations omitted). In reviewing the evidence a court must view the totality of the circumstances in the case through the eyes of the experienced officers involved in the arrest and "give 'due weight' to inferences drawn from the facts and circumstances of each case by local law enforcement officers." ***Id.***

In this case, the officers had the name and a description matching Rodriguez-Lopez as someone involved with others selling "ice" methamphetamine (TR. 7-9). Officers received the information from the C/I, who also told officers where Rodriguez-Lopez worked with his brother "Freddy" in the conspiracy and at Old Market Auto (TR. 8). Anderson later corroborated some of the same information (TR. 25-27). Additionally, the Jeep Cherokee seen earlier during a drug buy was parked directly behind Rodriguez-Lopez's home (TR. 19, 392). Shortly before Rodriguez-Lopez's arrest, "Freddy" Rodriguez-Solis was arrested in another vehicle described as a vehicle involved in the drug conspiracy (TR. 26-27; 42-43; 291). By the time of the arrest, the officers had also searched Apartment 2 and Apartment

20

7, finding quantities of methamphetamine and currency.  The officers also had in custody other members of the alleged conspiracy and information linking those members to Rodriguez-Lopez, Rodriguez-Lopez's vehicle and the Poppleton Avenue apartments. Finally, the officers were familiar with Rodriguez-Lopez based on two previous narcotics investigations (TR. 109-110; 487-488).  Under the circumstances of this case, Rodriguez-Lopez's warrantless arrest was proper, and the search of his person and seizure of his cellular telephone were valid as a search incident to a lawful arrest, regardless of whether the cellular telephone was obtained from Rodriguez-Lopez immediately before or after his arrest.  Accordingly, Rodriguez-Lopez's motion to suppress should be denied to the extent he contends his arrest or the search of his person was unconstitutional.

### D.  Hernandez-Mendoza's Motion to Suppress (Filing No. 33)

Hernandez-Mendoza asserts that he and his vehicle were illegally stopped, that he and his vehicle were illegally searched, that he was illegally arrested, and that, while under arrest, he was transported to 2616 Poppleton Avenue where law enforcement officers illegally entered Apartment No. 7 without a warrant.  He further asserts the inadmissability of statements he made while in Apartment No. 7.  The government asserts law enforcement officers had probable cause to stop Hernandez-Mendoza's vehicle because of traffic violations, that there was probable cause to arrest Hernandez-Mendoza because he was driving on a suspended license, that the subsequent search of Hernandez-Mendoza was incident to arrest as was the search of his vehicle, and the entry into Apartment No. 7 without a warrant was based on exigent circumstances.  The government asserts that Hernandez-Mendoza's statements made during the time he was being held in Apartment No. 7, 2616 Poppleton Avenue, were volunteered and not the product of a custodial interrogation.  Further, the government asserts that any evidence discovered in Apartment No. 7 prior to the arrival of the search warrant would be admissible under the inevitable discovery doctrine.

"[A] police officer who personally observes a traffic violation has probable cause to stop the vehicle." ***United States v. $404,905.00 in U.S. Currency***, 182 F.3d 643, 646 (8th Cir. 1999) **citing *Pennsylvania v. Mimms***, 434 U.S. 106, 109 (1977).  "Even assuming

[the police officer] was looking for [the defendant], it would be "objectively reasonable" to pull over a vehicle which was" engaging in a traffic offense. *United States v. Miller*, 20 F.3d 926, 929 (8th Cir. 1994). Contemporaneous with a valid traffic stop, a police officer may detain the motorist while completing a number of routine tasks such as computerized checks of the vehicle registration, driver's license and criminal history, and issuing a citation. *$404,905.00*, 182 F.3d at 647; **see also** *United States v. Sokolow*, 490 U.S. 1, 7 (1989). Additionally, the police officer may inquire about the motorist's destination, purpose of the trip and whether the police officer may search the vehicle. *$404,905.00*, 182 F.3d at 647; *U.S. v. Allegree*, 175 F.3d 648, 650 (8th Cir. 1999). The police officer may take further action as necessitated by the information volunteered by the motorist, observations of the contents of the vehicle, perceptions made the police officer regarding illegal drug use, and divergent information from the passengers. *$404,905.00*, 182 F.3d at 647; *Allegree*, 175 F.3d at 650-51.

Hernandez-Mendoza was driving while his license was suspended. Such was a violation of Nebraska law. *Neb. Rev. Stat*. § 60-486. As such, Hernandez-Mendoza was arrested and he and the automobile were subject to search incident to that arrest. **See** discussion in Rodriguez-Solis section above. The evidence seized is admissible in evidence.

Hernandez-Mendoza was removed from the scene of his arrest and brought to Apartment No. 7, 2616 Poppleton Avenue, where he was kept inside pending the arrival of a search warrant that was being prepared. During the time that Hernandez-Mendoza was kept in Apartment No. 7, he made several alleged incriminating statements accompanied by gestures regarding drugs hidden in the apartment. These statements and gestures were not the product of interrogation but were volunteered when he heard the officers conducting the search in the apartment above. "Interrogation in the *Miranda* context refers to express questioning and to words or conduct that officers should know is 'reasonably likely to elicit an incriminating response from the suspect.'" *United States v. Briones*, 390 F.3d 610, 612 (8th Cir. 2004) (**quoting** *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). "Miranda does not protect an accused from a spontaneous admission made under circumstances not induced by the investigating officers or during a conversation not

22

initiated by the officers." ***Butzin v. Wood***, 886 F.2d 1016, 1018 (8th Cir. 1989) (quotation omitted). Ordinarily, these statements would be admissible. However, the court finds these statements to have been the fruits of a poison tree and should be excluded under ***Wong Sun v. United States***, 371 U.S. 471, 487 (1963).

Officers entered Apartment No. 7 without a warrant and placed Hernandez-Mendoza in the room. The government seeks to justify the entry of Apartment No. 7 on the basis of exigent circumstances where there was a concern for officer safety. The court finds no reasonable basis for such concern. There was no evidence that the officers believed there were persons in the premises who may fire upon or harm the officers while they waited for the arrival of a search warrant. There was testimony that it was raining heavily outside. Such is not a basis for a determination of danger to the officers, especially when the officers had police vehicles available to them. The concern that a gang was involved and the officers needed some cover while waiting for the warrant is unreasonable under the testimony given in this matter. While there was some testimony that subjects of the investigation were probably members of the Sureños, a violent street gang, that membership constitutes no reasonable basis to believe that the officers' safety was in danger when the evidence indicated there were numerous police vehicles and law enforcement officers in the immediate area. Under the "exigent circumstances" exception, "the warrant requirement is suspended 'when--in the press of circumstances beyond a police officer's control--lives are threatened, a suspect's escape looms, or evidence is about to be destroyed.'" ***United States v. Johnson***, 12 F.3d 760, 764 (8th Cir. 1993) (citations omitted). "The exigent circumstances exception to the warrant requirement is narrowly drawn." ***Ball***, 90 F.3d at 263. The government bears the burden of establishing that exigent circumstances existed. ***Id.*** An exigency must be assessed in light of the totality of the circumstances. ***United States v. Wihbey***, 75 F.3d 761, 765 (1st Cir. 1996). The critical time for determining whether an exigency exists "is the moment of the warrantless entry by the officers onto the premises of the defendant." ***United States v. Morgan***, 743 F.2d 1158, 1162 (6th Cir. 1984). "The 'exigent circumstances' inquiry is limited to the objective facts reasonably known to, or discoverable by, the officers at the time of the search." ***United States v. Tibolt***, 72 F.3d 965, 969 (1st Cir. 1995).

No exigent circumstances warranted the officers to enter Apartment No. 7 without a warrant on the evening of March 21, 2005. The initial entry was illegal. As such, Hernandez-Mendoza was placed in the apartment following the illegal entry and he would not have been in the position to make the statements and gestures which are now alleged to be incriminatory. Such statements and gestures should be suppressed pursuant to **Wong Sun**.

Even though the exclusionary rule may require the exclusion of all evidence obtained by exploitation of an illegal search and seizure, the evidence gained may still be admissible if it was gained by means sufficiently distinguishable to be purged of the primary taint of the illegality. To that extent, three general exceptions have been carved from the exclusionary rule. First the "attenuated connection" exception applies where the chain between the challenged evidence and the primary taint of illegality is so long or only linked by sophisticated argument that exclusion of the evidence is not warranted. **See Wong Sun**, 371 U.S. at 487-88; **Nardone**, 308 U.S. at 338. Second, the "independent source" exception applies where evidence is admissible if the government can show it derived the evidence from a lawful source independent of the illegal conduct giving rise to the primary taint. **See Silverthorne Lumber Co.**, 251 U.S. at 385. Third, the "inevitable discovery" doctrine applies where the government can establish that it would have inevitably discovered the challenged evidence without reference to the illegal conduct giving rise to the primary taint. **See Nix v. Williams**, 467 U.S. 431 (1984).

The government must prove by a preponderance of the evidence that there was a reasonable probability the evidence would have been discovered by a lawful means in the absence of police misconduct and that the police were actively pursuing an alternative line of investigation. **United States v. Madrid**, 152 F.3d 1034, 1038 (8th Cir. 1998). In this case, the police officers were in the process of obtaining a search warrant for the premises at Apartment No. 7. The affidavit for a search warrant must contain probable cause of four ingredients: time, crime, objects, and place. 2 Wayne R. LaFave, **Search and Seizure**, § 3.7(d) at 372 (3d ed. 1996). As the Supreme Court stated in **Illinois v. Gates**, 462 U.S. 213, 238 (1983): "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him,

24

including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." ***Id.*** Thus, when viewing a search warrant, the court must look at the totality of the circumstances set forth in the affidavit. **See *id.*; *United States v. Etheridge***, 165 F.3d 655, 656 (8th Cir. 1999). "The duty of the judge issuing a search warrant is to make a 'practical, common-sense decision' whether, considering all the circumstances, a reasonable person could have reason to suspect that evidence would be discovered. . . . Probable cause is a fair probability that contraband evidence of a crime will be found in the location to be searched." ***United States v. LaMorie***, 100 F.3d 547, 552 (8th Cir. 1996). **See *Gates***, 462 U.S. at 238. A review of the search warrant issued for Apartment No. 7 demonstrates that there was probable cause to issue the warrant and the search of the premises was validly conducted pursuant to the warrant. Evidence seized pursuant to the search warrant should not be excluded from evidence in this matter.

Hernandez-Mendoza's motion to suppressed should be granted as to the statements and gestures made in Apartment No. 7 on March 21, 2005, but otherwise denied.

### IT IS RECOMMENDED TO JUDGE LAURIE SMITH CAMP that:

1.      Rodriguez-Solis' motion to suppress (Filing No. 37) be denied.

2.      Contreras-Cortez's motion to suppress (Filing No. 27) be denied as to the currency found on his person but otherwise granted.

3.      Rodriguez-Lopez's motion to suppress (Filing No. 31) be denied.

4.      Hernandez-Mendoza's motion to suppress (Filing No. 33) be should be granted as to the statements and gestures made in Apartment No. 7 on March 21, 2005, but otherwise denied.

### ADMONITION

Pursuant to NECrimR 57.3 any objection to this Report and Recommendation shall be filed with the Clerk of the Court within ten (10) days after being served with a copy of this Report and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such

objection.    Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

DATED this  27th day of January, 2006.

BY THE COURT:

 s/Thomas D. Thalken
United States Magistrate Judge